IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

STELLA MARIS, INC., an Oregon )
corporation, )
 )
        Plaintiff, ) No. 6:11-cv-954-HO
 )
 )
        v. ) ORDER
 )
CORK SUPPLY USA, INC., a California )
corporation, )
 )
        Defendant. )
 )

    Plaintiff, Stella Marris, Inc., brings this products liability action asserting damages sustained as a result of alleged contaminated agglomerated corks purchased from defendant, Cork Supply USA, Inc. for use in bottling wine. Plaintiff alleges it purchased agglomerated corks, in several lots, in 2009 and 2010 from defendant for use in bottling wine it produced at wineries in St. Paul, Oregon and Sunnyside, Washington. Plaintiff contends that shortly after selling wines bottled with the agglomerated corks, customers reported

that they believed the wines were contaminated with 2,4,6-trichloroanisole (TCA).

Plaintiff asserts that an investigation revealed that all of the wines bottled using defendant's agglomerated corks were contaminated with TCA due to defective corks provided by defendant. Plaintiff alleges resulting damages of $1,719,470 as well as damage to its reputation in the amount of $6,000,000. Plaintiff alleges claims for products liability, negligence, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness, and negligent misrepresentation.

Defendant seeks dismissal of all claims based on a binding arbitration clause in the contracts regarding the sale of the corks. Alternatively, defendant seeks a stay pending arbitration.

There are eight separate purchase agreements at issue. The purchases were made between October 27, 2009, and August 4, 2010. Plaintiff would place an order for corks and defendant would send a Confirmation and Purchase Contract to plaintiff. A representative for plaintiff would sign the contract and return it. Each contract explicitly stated:

> Acceptance of your order by Cork Supply USA, Inc. ("Seller") is expressly conditioned on your acceptance to the additional or different items in the Terms and Conditions of Sale attached to an Order Confirmation*. Your signature on this Order Confirmation constitutes such acceptance.
>
> **PURCHASER'S ACCEPTANCE OF DELIVERY OF CORKS REPRESENTS PURCHASER'S ACCEPTANCE OF THESE TERMS AND CONDITIONS. THIS**

2 - ORDER

> **DOCUMENT CONSTITUTES THE ENTIRE CONTRACT BETWEEN THE PURCHASER AND SELLER. PLEASE READ IT CAREFULLY.**
> The terms of this contract take precedence over Purchaser's terms and conditions. Neither Seller's commencement of performance nor delivery of corks shall be deemed or construed as acceptance of Purchaser's terms and conditions.
>
> *Please contact Seller for additional copies of the Terms and Conditions of Sale.

Purchase Contracts (attached to Declaration of James Herwatt (#21) at Ex. 1) at pp. 1-8.

However, the Terms and Conditions are contained in a separate document. Defendant asserts that the Terms and Conditions were provided to plaintiff on about May 6, 2008, February 9, 2009, and January 11, 2010.[1] Given the apparent one sided nature of the Terms and Conditions, it is not difficult to understand why defendant chose not to attach them to the all purchase agreements:[2]

---

[1] Defendant also asserts that plaintiff received prior versions of the Terms and Conditions on July 7, 2003, and July 6, 2003, which also contained an arbitration clause. Defendant provides evidence from its internal records keeping system that it sent copies of the Terms and Conditions to plaintiff on these dates. See Declaration of James Herwatt (#21) and Supplemental Declaration of James Herwatt (#38) and attached exhibits.

[2] Defendant states that it used to send a copy of the Terms and Conditions with each purchase contract, but that given the number of separate orders per year by a given customer, including the terms with each order resulted in too much paperwork.

3 - ORDER

## CORK SUPPLY USA, INC. NEWPAK USA, INC.
## TERMS AND CONDITIONS OF SALE

**PART 1- Terms and Conditions of Sale Applicable to sale of corks ... collectively referred to herein as the "Products")**

. . . .

### Section 4. Returns/Cancellations.

Products may not be returned and orders may not be canceled without Seller's consent, which consent may be withheld for any reason whatsoever.

. . . .

### Section 6. Force Majeure.

Seller has no liability for any delay in delivery or any other failure to perform if such non-performance is caused by circumstances beyond Seller's control, including, but not limited to, strikes, work stoppages or labor demands, lock-outs, fires, delays of carriers inability to obtain materials or shipping space, government interference, inclement weather, acts of God, acts of war, civil disobedience or terrorism.

### Section 7. Claims for Defects.

All claims for defects, shortages, or delays in delivery shall be waived unless presented in writing within 90 days from the date of receipt of the Products by Purchaser. If delivery of the Products is to be in installments, any delay or default with respect to any installment shall not affect Purchaser's obligation to accept and pay for all remaining installments.

### Section 8. Suspension/Cancellation of seller's Duty to Perform.

If Purchaser fails to obtain any necessary license or permit, fails to make timely payment of any Invoice or otherwise is in breach of this contract, Seller may, in its sole discretion and without waiving any other rights or remedies which Seller may have, suspend delivery on any

unfilled Purchase Orders from Purchaser and unilaterally cancel any obligation of Seller to later perform any unperformed obligations under any contract with Purchaser. Refusal to deliver under this provision shall not be considered a breach of any contract by Seller, as obtaining necessary licenses or permits and the timely payment of all invoices shall be considered a necessary condition precedent to the Seller's duty to perform.

. . . .

**Section 10. Delinquent Payment Charge.**

Payment to Seller is due in full as invoiced. Purchaser agrees that in the event it fails to make payment when due, including a failure to pay based on a returned check, a late payment charge shall be assessed to cover Seller's additional expenses in collection and its loss of the use of the money due. The late payment charge shall consist of a 1-1/2% service charge on the unpaid amount for each month or part of a month following the Invoice Due Date during which the amount owed remains unpaid until cash is finally received. The parties do not intend that any action taken in connection with any sale of Products arising out of this contract constitute a loan or forbearance, nor that any amount paid or agreed to be paid pursuant to such sale exceed the maximum permissible under any applicable law. The parties agree it is extremely difficult to ascertain the actual damages resulting to Seller and that the late payment charge provided for is a reasonable attempt to estimate the actual damages that will be incurred by Seller if Purchaser fails to pay amounts when due.

**Section 11. Limitation of Liability.**

**SELLER SHALL NOT BE LIABLE FOR SPECIAL, DIRECT OR INDIRECT OR CONSEQUENTIAL DAMAGES, SUCH AS, BUT NOT LIMITED TO, DAMAGE FOR LOSS OF OTHER PROPERTY OR EQUIPMENT, LOSS OF PROFITS OR REVENUE, COST OF CAPITAL OR CLAIMS OF PURCHASER'S CUSTOMERS, OR FOR ANY PUNITIVE DAMAGES, ARISING UNDER OR RELATING IN ANY WAY TO THIS CONTRACT OR ANY ACTIONS TAKEN IN CONNECTION THEREWITH.** The remedies of Purchaser in this contract are exclusive. The liability of Seller with respect to the sale, delivery or resale of any Products pursuant to this contract, whether in contract, in tort, under any warranty, or otherwise, shall not exceed the difference between the price of the Products as specified in this contract and the value of the Products as

delivered by Seller. All claims for breach of contract not otherwise covered by Section 7 hereof shall be commenced by Purchaser within one year from the date of shipment of the Products.

**Section 12. Arbitration.**

**ALL DISPUTES BETWEEN PURCHASER AND SELLER UNDER THIS CONTRACT SHALL BE RESOLVED BY ARBITRATION ACCORDING TO THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION.** There shall be one arbitrator. If the parties fail to select a mutually agreeable arbitrator within 30days after the demand for arbitration is mailed, the American Arbitration Association shall select the arbitrator. Arbitration shall take place in Solano County, California. All decisions of the arbitrator shall be final, binding and conclusive on the parties and arbitration shall be the only method of resolving disputes under this contract. In any arbitration or other proceeding, the prevailing party shall be awarded its attorneys' fees.

**Section 13. Governing Law and Venue.**

The rights and obligations of the parties in this contract shall be governed by the internal laws of the State of California. Purchaser and Seller agree that the United Nations Convention on Contracts for the International Sale of Goods ("CISG"), shall not be a part of the law applicable to this contract.

**Section 14. Assignment**

Purchaser may not assign any of its rights or obligations under this contract in whole or in part, without the prior written consent of Seller.

. . . .

PART 2 - Terms and Conditions of Sale Applicable only to Corks sold by Cork Supply USA, Inc.

**Section 16. Characteristics of Cork.**

16.1. Grade. Purchaser understands that corks are a natural product and contain such imperfections and inconsistencies as occur in nature. Purchaser further understands that grading of corks is done by visual inspection of only the

6 - ORDER

outside of the cork. Each grade will contain a percentage of corks of other grades. Corks of a particular grade sold to Purchaser by this contract are a combination of corks. Corks are subject to variations in weight, color, size, coating ingredients and quantities as are standard in the trade.

16.2. Use. Seller warrants that the corks have been coated with a compound prepared by Seller, and appropriate for use in bottling liquid. Purchaser has full responsibility for its use of the corks including without limitation, the tightness of the seal, the effect of the use of the corks on the wine being bottled and the ability of the corks to prevent seepage and leakage. Please note the Recommended Corking Practices included with the corks and/or available from Seller. **CORRECT BOTTLING PRACTICES ARE CRITICAL FOR PROPER PERFORMANCE OF CORKS.**

16.3. Taste and Aroma. Purchaser understands that liquids which have been bottled using natural cork closures may occasionally exhibit what is commonly referred to as a "corky" taste or aroma. Purchaser understands that a percentage of all corks contain compounds which can result in particular aromas or tastes. The presence of these compounds is impossible to determine without destroying the cork. Accordingly, Seller gives no representation or warranty as to the effect of the use of the corks on the taste and aroma of the liquid.

**16.4. No Warranties. THE WARRANTY IN THIS SECTION 16 FOR CORKS IS EXCLUSIVE AND IS IN LIEU OF ANY OTHER WARRANTY WHETHER EXPRESS OR IMPLIED, AND INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHER WARRANTY.**

Terms and Conditions (attached to Declaration of James Herwatt (#21) at Ex. 2) at pp. 1-3.

It is undisputed that none of the purchase contracts at issue had the Terms and Conditions attached. Plaintiff disputes that it ever received the Terms and Conditions. Nonetheless, defendant contends that the Terms and Conditions are part of the contracts.

7 - ORDER

Before it can be determined whether the contracts at issue include the above Terms and Conditions, including the arbitration clause, the court must decide which law applies.

Although the parties purportedly agree to the law of California as the governing law, that agreement is also contained in the unattached Terms and Conditions. Because the issue is whether the parties agreed to the Terms and Conditions, it is necessary to determine what law applies in determining the terms of the agreement.

The conflict of law rules of Oregon apply in this federal action. See, e.g., Klaxton Co. v. Stentor Co., 313 U.S. 487, 496 (1941) (The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts). ORS §§ 81.100 - 81.135 governs the choice of laws for contracts. Under ORS § 81.120(1) "the contractual rights and duties of the parties are governed by the law or laws that the parties have chosen," but "[t]he choice of law must be express or clearly demonstrated from the terms of the contract. In a standard-form contract drafted primarily by only one of the parties, any choice of law must be express and conspicuous." ORS § 81.120(2). If an effective choice of law has not been made, "the rights and duties of the parties with regard to an issue in a contract are governed by the law, in light of the multistate elements of the contract, that is the most appropriate for a resolution of that issue." ORS § 81.130.

The most appropriate law is determined by:

>    (1) Identifying the states that have a relevant connection with the transaction or the parties, such as the place of negotiation, making, performance or subject matter of the contract, or the domicile, habitual residence or pertinent place of business of a party;
>
>    (2) Identifying the policies underlying any apparently conflicting laws of these states that are relevant to the issue; and
>
>    (3) Evaluating the relative strength and pertinence of these policies in:
>
>>        (a) Meeting the needs and giving effect to the policies of the interstate and international systems; and
>>
>>        (b) Facilitating the planning of transactions, protecting a party from undue imposition by another party, giving effect to justified expectations of the parties concerning which state's law applies to the issue and minimizing adverse effects on strong legal policies of other states.

ORS § 81.130.

The choice of law provision, as it appears in the Terms and Conditions themselves, is express and conspicuous. Because the contract purports to apply the law of California, the choice of law provision is valid as to form if it meets the requirements of California law. The primary issue is whether the Terms and Conditions are validly part of the Purchase Contracts via the clause incorporating the Terms and Conditions as a condition of acceptance. That language incorporates the Terms and Conditions attached to an order confirmation. The language indicates that the attachment may not necessarily mean the particular order confirmation, which is confirmed by the notation that additional copies of the Terms and

9 - ORDER

Conditions are available via contact with the seller.[3] For the court to find, as a matter of law, that the Terms and Conditions are part of the agreement at issue, the availability of the Terms and Conditions upon request must be sufficient to incorporate the terms.

> A contract may validly include the provisions of a document not physically a part of the basic contract.... "It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document... But each case must turn on its facts.... For the terms of another document to be incorporated into the document executed by the parties, the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known **or easily available to the contracting parties.**" Shaw v. Regents of University of California (1997) 58 Cal.App.4th 44, 54, 67 Cal.Rptr.2d 850.

Wolschlager v. Fidelity Nat. Title Ins. Co., 111 Cal.App.4th 784, 790 (2003) (emphasis added).

Here, each Purchase Contract referred to the "Terms and Conditions of Sale attached to an Order Confirmation," and directed

---

[3] Defendant maintains that it basically provides the Terms and Conditions with the "first order, by and large, or the first time a sample is sent to the year." Deposition of James Herwatt, CEO of Cork Supply, at pp. 36-37 (attached to Declaration of David Earnst (#31) as Ex. 1). Plaintiff maintains that it has never received a copy and defendant apparently has no internal record of whether any customers actually receive a copy of the Terms and Conditions only that they are sent. In addition, it appears that defendant's practice is to throw way the copy of the Terms and Conditions it faxes to a customer after it receives a signed order back from the customer. Nonetheless, there is no evidence to suggest that a request from a customer for a copy of the terms and Conditions has been or would be denied.

10 - ORDER

the purchaser to contact the seller for additional copies of the Terms and Conditions of Sale. The agreement clearly references the Terms and Conditions and those terms were easily available by contacting the seller. Although plaintiff denies ever receiving a copy of the terms,[4] a representative signed the agreement next to the portion where the incorporation by reference appears. Indeed, plaintiff's office manager, who signed the purchase agreements at issue, states that she saw the language incorporating the Terms and Conditions. Declaration of Mary Radcliffe (#33) at ¶ 6. Although, she states that none of the Purchase Contracts had additional terms and conditions attached, the agreement clearly directs the purchaser to contact the seller for copies. Cf. id. at 791 (arbitration provision upheld where a preliminary report referred to the policy containing the arbitration provision and copies of the policy were available from the office which issued the report even though not attached to the report). Even though plaintiff contends it was unaware of the arbitration provision, or any of the terms in the Terms and Conditions, the Terms and Conditions were easily available and thus binding upon plaintiff. See id. ("[E]ven if plaintiff did

---

[4] To refute evidence that the Terms and Conditions were sent, plaintiff provides declarations of two employees who state they never saw the Terms and never heard anyone say they had seen them. This is insufficient to defeat summary judgment because under California law, it is only necessary that the incorporated terms be clearly referenced and easily available.

11 - ORDER

not know about the arbitration clause, the Policy with the clause was easily available to him. The preliminary report identified the Policy by name and directed the plaintiff to where he could inspect it. Nothing further was needed to bind the plaintiff.")

The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract. <u>Bank of the West v. Superior Court</u> 2 Cal.4th 1254, 1264 (1992). That intent is interpreted according to objective, rather than subjective, criteria. <u>Wolf v. Walt Disney Pictures & Television</u> 162 Cal.App.4th 1107, 1126 (2008). When the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement. Cal. Civ. Code, § 1638 ("language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"; Cal. Civ. Code, § 1639 ("[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"). The words are to be understood "in their ordinary and popular sense." Cal. Civ. Code § 1644.

Although plaintiff interprets the purchase agreements to reference only terms attached to each Purchase Contract, the contract language does not support such an interpretation. The agreements, as noted above, incorporate "the Terms and Conditions of Sale attached to <u>an</u> Order Confirmation" (emphasis added). Nothing in the language

requires the terms to be attached to that specific agreement. Moreover, the context of the statement indicates that the terms are separate as indicated by the notation to call for copies. Because the clear and explicit language incorporated additional terms easily available by calling the seller, the intention of the parties was to include such terms.

Moreover, the integration clause does not serve to prevent inclusion of the additional terms expressly incorporated by each Purchase Contract. See <u>Bell v. Rio Grande Oil Co.</u> 23 Cal.App.2d 436, 440 (1937)("A written agreement may, by reference expressly made thereto, incorporate other written agreements; and in the event such incorporation is made, the original agreement and those referred to must be considered and construed as one.")

Because, under California law, the Terms and Conditions containing the choice of law provision is validly incorporated into the purchase agreements at issue, California law applies and plaintiff is bound by the Terms and Conditions. Those terms include the obligation to arbitrate disputes under the contract.

Plaintiff also contends that the Terms and Conditions should not be enforced because they are unconscionable. As noted above, the Terms and Conditions incorporated into each Purchase Contract appear one-sided and plaintiff focuses on many of the terms in an effort to show unconscionability. In reading the Terms and Conditions as a whole, the court is inclined to agree. However, an attack to an

13 - ORDER

agreement, beyond the arbitration clause, is to be determined by the arbitrator if a valid arbitration clause is present. <u>Prima Paint Corp. v. Flood and Conklin Mfg. Co.</u>, 388 U.S. 395, 403-04 (1967) (attacks on the validity of an entire contract, as distinct from attacks on the arbitration clause, are for the arbitrator); <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 443, 446 (2006) (claim that contract void *ab initio* under state law is within the province of the arbitrator). Accordingly, the court may only determine whether the arbitration clause itself is unconscionable.

Unconscionability has a procedural and a substantive element. <u>Little v. Auto Stiegler, Inc.</u>, 29 Cal.4th 1064, 1071 (2003). The procedural element focuses on oppression or surprise due to unequal bargaining power, and the substantive element focuses on overly harsh or one-sided results. <u>Id</u>.

The procedural element of an unconscionable contract generally takes the form of a contract of adhesion forcing one party only the opportunity to adhere to the contract or reject it. <u>Id</u>. Adhesion is not enough to show a contract is unduly oppressive. Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice. <u>A & M Produce Co. v. FMC Corp.</u>, 135 Cal.App.3d 473, 486 (1982). Surprise involves the extent to which the supposedly agreed-upon terms are hidden in a printed form drafted by the party seeking to enforce the disputed terms. <u>Id</u>.

14 - ORDER

Contracts necessarily allocate risks. A contractual provision is substantively suspect if it reallocates the risks in an objectively unreasonable or unexpected manner. Id. at 487. To be unenforceable, a contract provision must be both procedurally and substantively unconscionable, although the greater the procedural unconscionability, the less unreasonable the risk reallocation that will be tolerated. Id.

There is evidence in the record to suggest that defendant would not entertain any changes to the arbitration clause and indeed the Purchase Contract itself indicates that the Purchaser's terms would not be accepted. So the arbitration clause might well be considered to be on a take it or leave it basis. However, plaintiff never attempted to negotiate the terms and there is no suggestion that plaintiff was unable to utilize another supplier. Plaintiff fails to establish a substantial degree of inequality of bargaining power.

The arbitration clause itself is not particularly oppressive. Although plaintiff asserts it has never seen the Terms and Conditions, at a minimum, they were easily available upon request. The clause is highlighted with bold print and capital letters. The only one-sided part of the clause involves the location of the arbitration, otherwise both parties give up their rights to have a court resolve any disputes. There are no one-sided allocations of expenses or discovery rights, etc. The arbitration provision certainly cannot be read so as to shock the conscience. See Walnut

15 - ORDER

Producers of California v. Diamond Foods, Inc., 187 Cal.App.4th 634, 648 (2010) (courts should not change a contractual term that the parties have agreed to merely because the court believes the terms are unreasonable, the term must shock the conscience). The inclusion of the arbitration clause is not unconscionable. Thus, the issue reduces to what did the parties agree to arbitrate.

Federal substantive law governs the question of arbitrability. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 240 (1983). The FAA reflects Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause. See Republic of Nicaragua v. Standard Fruit Co., 937 F.2d 469, 475 (9th Cir. 1991) (citing Perry v. Thomas, 482 U.S. 483, 490 (1987)). The FAA embodies a clear federal policy in favor of arbitration. See 9 U.S.C. § 2 "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone, 460 U.S. at 24-25.

The standard for demonstrating arbitrability is not high. The FAA leaves no place for the exercise of discretion by a district court, but instead requires that a district court direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed. See Dean Witter Reynolds v. Byrd, 470 U.S. 213, 218 (1985). A district court can determine only whether a written arbitration agreement exists, and if it does, enforce it in

accordance with its terms. See Howard Elec. & Mech. v. Briscoe Co., 754 F.2d 847, 849 (9th Cir. 1985).

A court, in construing a valid arbitration agreement within the coverage of the FAA, applies ordinary principles of state contract law to determine whether the parties have agreed to arbitrate a particular dispute. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). As noted above, under California law, the parties have agreed to arbitrate disputes under the contract.

However, in the Ninth Circuit, arbitration clauses are not as liberally construed as in other circuits. Generally arbitration clauses such as "arising under" an agreement or "arising out of" as opposed to arising "in connection with" or "related to" are interpreted more narrowly to involve an agreement to arbitrate only claims relating to interpretation and performance of the contract itself and not collateral to the contract. See, e.g., Mediterranean Enterprises, Inc. v. Ssangyong Corp., 708 F.2d 1458, 1464 (1983). The arbitration clause at issue refers to disputes "under this contract." Accordingly, the parties in this case only agreed to arbitrate claims relating to interpretation and performance of the contracts themselves.[5]

---

[5] This is further demonstrated by the parties use of the language "arising under or relating in any way to this contract," with respect to the limitation of liability in section 11 (emphasis added). Had the parties intended such broad coverage for the arbitration provision, they would have included

(continued...)

17 - ORDER

Plaintiff's contract claims and claims relying on interpretation of the contracts necessarily fall under the arbitration provision. Moreover, the products liability claim requires examination of the negotiation of the allocation of risks which depends on interpretation of the contract. See Kaiser Steel Corp. v. Westinghouse Elec. Corp., 55 Cal.App.3d 737, 748 (Since the manufacturer and buyer have bargained in a commercial setting not only for the product but also for the measure and mode of reimbursement for defects in the product, any societal interest in loss shifting is absent. Whether the loss is thrust initially upon the manufacturer or customer, it is ultimately passed along as a cost of doing business included in the price of the products of one or the other and thus spread over a broad commercial stream). The issue of whether a products liability claim can be applied in this situation should be reserved to the arbitrator initially. See, id.:

> the doctrine of products liability does not apply as between parties who: (1) deal in a commercial setting; (2) from positions of relatively equal economic strength; (3) bargain the specifications of the product; and (4) negotiate concerning the risk of loss from defects in it.

If the arbitrator concludes that a products liability claim can apply, then the claim should be determined by this court at the conclusion of the arbitration of the contract claims.

The parties appear to have similarly allocated the risk traditionally associated with negligent manufacture of the corks to

---

[5](...continued)
similar language in the arbitration clause.

the purchaser via the contract. Thus, it is unclear if the negligence and negligent misrepresentation claims can survive after interpretation of the agreement by the arbitrator. Section 11 of the Terms and Conditions purports to limit all tort liability. If the arbitrator concludes that the provision is not unconscionable and may be enforced, that is likely the end of the matter. Otherwise, the court retains jurisdiction to hear the tort claims if necessary. Accordingly, this action is stayed pending arbitration. After the results of arbitration are received, the court will adjudicate the issues which fall outside the scope of arbitration if any remain after interpretation of the agreement. See Mediterranean Enterprises, Inc., 708 F.2d at 1465.

## CONCLUSION

For the reasons stated above, defendant's motion to stay pending arbitration (#19) is granted to the extent noted above.

DATED this 26th day of April, 2012.

_____
Michael R. Hogan
United States District Judge